# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| INTERNATIONAL INFORMATION SYSTEMS SECURITY CERTIFICATION CONSORTIUM, INC.,<br>　　　Plaintiff,<br>　　　v.<br>SECURITY UNIVERSITY, LLC, and SONDRA SCHNEIDER,<br>　　　Defendants. | No. 3:10-cv-01238 (MPS) |

## RULING ON MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO SEAL

Plaintiff International Information Systems Security Certification Consortium, Inc. ("(ISC)[2]") has sued Defendants Security University, LLC ("SU") and Sondra Schneider for alleged violations of the Lanham Act, 15 U.S.C. §§ 1051-1141, including trademark infringement, false designation of origin, and trademark dilution, and for alleged violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a et seq. ("CUTPA"). The parties have filed cross-motions for summary judgment. (Dkt. ## 66, 68.) Because I find that Defendants' use of the trademark at issue was permissible under the doctrine of "nominative fair use," and that Plaintiff's mark is not famous for the purposes of trademark dilution, Defendants' Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED. For the reasons explained below, the parties' Motions to Seal are GRANTED IN PART, and DENIED IN PART.

## I.    Relevant Background

Plaintiff is a non-profit organization formed in 1989 to develop standards for the information security industry. (Defs. L.R. 56(a)(2), ¶ 1.) In March 1990, Plaintiff began using the mark "CISSP®," which denotes a Certified Information Systems Security Professional who has met certain requirements and standards of competency in the information security field,

including passing the examination for CISSP® certification, which Plaintiff administers.  (*Id.*, ¶¶

12-13, 25.)  CISSP® is a special type of trademark known as a "certification mark."  The Lanham

Act defines a "certification mark" as:

> any word, name, symbol, or device, or any combination thereof (1) *used by a person other than its owner*, or (2) which its owner has a bona fide *intention to permit a person other than the owner to use* in commerce and files an application to register on the principal register established by this chapter, to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services . . . .

15 U.S.C. § 1127 (emphasis added).  As the language italicized above makes clear, a certification

mark, unlike other trademarks, is specifically designed to be used by those other than its owner.

Unlike trademarks, certification marks may not be discriminately refused to anyone who meets

the standards set forth by the certifier.  *See* 3 J. THOMAS MCCARTHY, MCCARTHY ON

TRADEMARKS AND UNFAIR COMPETITION § 19.96 ("[A] certifier cannot refuse to license the

mark to anyone on any ground other than the standards it has set."); 15 U.S.C. § 1064(5)(D)

(certification mark may be cancelled if registrant discriminately refuses to certify).  One who

sees a certification mark "is entitled to assume that that product or service in fact meets whatever

standards of safety or quality have been set up and advertised by the certifier."  *See* 3 J. THOMAS

MCCARTHY, *supra*, § 19.91 (4th ed. 2011).  In addition, a certification mark promotes "free and

open competition among producers and distributors of the certified product."  *Idaho Potato

Comm'n v. M & M Produce Farm & Sales*, 335 F.3d 130, 138 (2d Cir. 2003).

On March 18, 1997, the United States Patent and Trademark Office issued to Plaintiff a

trademark registration for the CISSP® certification mark.  (Defs. L.R. 56(a)(2), ¶ 14; Pl. Summ.

J. Mem., Ex. I.)

Upon meeting Plaintiff's certification standards, an individual may use the CISSP® mark

in accordance with the "(ISC)²® Regulations Governing Use of Certification/Collective Marks."

(Pl. Summ. J. Mem., Ex. N.)   The Regulations provide that, in using the mark, certified individuals "may not combine the Logo with any other object, including, but not limited to, other logos, icons, words, graphics, photos, [or] slogans . . . . (i.e., Mixing another Logo with the CISSP[®] Logo to create a variation.)"[1]   (*Id.*)   Another rule requires that "[t]he Logo may not be used in any manner that expresses or might imply (ISC)$^2$'s affiliation, sponsorship, endorsement, certification, or approval, other than as set forth by the (ISC)$^2$ Application Agreement."   (*Id.*)

Defendant SU, a for-profit company, was formed in 1999 by Defendant Sondra Schneider, a CISSP® certified individual, to provide information security training.   (Defs. L.R. 56(a)(2), ¶¶ 5-8; Schneider Decl., ¶¶ 1-2.)   SU offers classes to individuals preparing for the CISSP® certification examination, as well as for other certifications offered by SU.   (Schneider Decl., ¶¶ 3, 5.)   The company advertises its certification-specific training courses on its website, www.securityuniversity.net, and through "conference event or brochure specific advertising materials."   (*Id.* ¶ 16.)   It has used the CISSP® mark in connection with certification-specific training courses since 2001.   (*Id.* ¶ 17.)   It is undisputed that SU is allowed to use the CISSP® certification mark in its advertising.   (Pl. Opp. to Defs. Summ. J. Mem. at 4 ("Plaintiff does not dispute, nor has it ever disputed, Defendants' right to identify that their services are directed towards preparing for the CISSP[®] certification examination.").)

In some advertisements, however, Defendants stated that the CISSP® examination preparation course would be taught by "Master CISSP® Instructor Clement Dupuis," "Master CISSP® Clement Dupuis," and/or "CISSP® Master Clement Dupuis."   (*See* Pl. Summ. J. Mem., Exs. M, P-T.)   SU began using the term "Master" in May 2010; it no longer uses this term in its advertising materials.   (Schneider Decl., ¶¶ 19, 22.)   On June 9, 2010, Plaintiff's counsel wrote to

---

[1] As defined by Plaintiff's regulations, the term "Logo" includes the CISSP® certification mark.

Defendant Schneider asking that she cease using the phrase "Master CISSP" in SU's advertisements.  (Compl., Ex. D.)  On June 13, 2010, Defendant Schneider emailed Marc Thompson, an employee of a third party entity that oversees seminars on Plaintiff's behalf, that "SU will continue to use the word Master.  Master Clement Dupuis is a Male Teacher [and] thus he is a Master according to the dictionary."  (Pl. Summ. J. Mem., Ex. O; Defs. L.R. 56(a)(2), ¶ 32.)  On July 15, 2010, Plaintiff's counsel "again wrote to Ms. Schneider requesting that she and SU cease and desist their improper advertising."  (Defs. L.R. 56(a)(2), ¶ 34.)

On August 3, 2010, Plaintiff commenced this action, alleging violations of the Lanham Act and CUTPA.  Notably, Plaintiff does not allege any claims for breach of contract or violation of the "(ISC)$^{2®}$ Regulations Governing Use of Certification/Collective Marks."  (*See* Pl. Summ. J. Mem., Ex. N.)

## II.  **Discussion**

### A.  **Standard**

Under Fed. R. Civ. P. 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "When viewing the evidence [on a motion for summary judgment], the court must assess the record in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B.  First and Second Counts: Claims for Trademark Infringement

The First and Second Counts allege that Defendants infringed the CISSP® mark in violation of 15 U.S.C. § 1114 by using the mark in a way "likely to cause confusion, or to cause mistake, or to deceive."  The gravamen of Plaintiff's First and Second Counts is that Defendants' "improper use of the CISSP[®] mark is likely to cause confusion, to cause mistake, or to deceive members of the public into believing that Plaintiff's mark is somehow capable of being 'mastered' and that such mastery is only available from [Defendants]."  (Compl., ¶¶ 22, 42.)

"A claim of trademark infringement is analyzed under a familiar two-prong test.  The test looks first to whether the plaintiff's mark is entitled to protection, and second to whether the defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods."  *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 456 (2d Cir. 2004).  "To evaluate the likelihood of consumer confusion, [courts] apply the multi-factor test set forth by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)."[2]  *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 130 (2d Cir. 2004).  Claims for certification mark infringement are also evaluated under the multi-factor *Polaroid* test.  *See Levy v. Kosher Overseers Ass'n of Am., Inc.*, 104 F.3d 38, 42-43 (2d Cir. 1997).

Defendants counter Plaintiff's claims for trademark infringement by asserting that "any use of the CISSP[®] mark . . . is in a legitimate, descriptive manner with respect to the services offered by SU, and is protected by the doctrine of nominative fair use."  (Countercl., ¶ 44.)[3]  As

---

[2] The *Polaroid* test "requires analysis of several non-exclusive factors, including: (1) the strength of the mark, (2) the degree of similarity between the two marks, (3) the competitive proximity of the products, (4) actual confusion, (5) the likelihood the plaintiff will bridge the gap, (6) the defendant's good faith in adopting its mark, (7) the quality of the defendant's products, and (8) the sophistication of the purchasers."  *Brennan's*, 360 F.3d at 130.
[3] While the Third Circuit treats nominative fair use as an affirmative defense, the Ninth Circuit "views the doctrine as a modification to the likelihood-of-confusion analysis of the plaintiff's

discussed below, when a defendant asserts the application of nominative fair use, the nominative fair use analysis supplants the likelihood of confusion inquiry.  *Audi AG v. Shokan Coachworks, Inc.*, 592 F. Supp. 2d 246, 269-70 (N.D.N.Y. 2008).  Because I find that the nominative fair use doctrine resolves the trademark infringement claims in this case, I turn directly to the analysis of nominative fair use.

Courts "distinguish two types of fair use: 'classic fair use,' in which the defendant has used the plaintiff's mark to describe the defendant's own product, and 'nominative fair use,' in which the defendant has used the plaintiff's mark to describe the plaintiff's product for the purpose of, for example, comparison to the defendant's product."  *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150 (9th Cir. 2002); *see also* 4 J. Thomas McCarthy, *supra*, § 23:11.  District courts in the Second Circuit have consistently applied the test for nominative fair use developed in *New Kids on the Block v. News America Publishing Inc.*, 971 F.2d 302 (9th Cir.1992), to trademark infringement cases, although the Court of Appeals has not formally adopted this test.[4]

---

underlying infringement claim."  *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102 n.7 (2d Cir. 2010).  Plaintiff argues that if the doctrine is an affirmative defense, then Defendants have waived it because they did not raise it in their Answer.  (Pl. Opp. to Defs. Summ. J. Mem. at 13 (citing Answer and Countercl.).)  This argument fails because, as noted, Defendants referenced the doctrine in their counterclaim, which seeks a declaratory judgment that they are not liable for trademark infringement.  (Countercl., ¶ 44.)  Further, district courts in this Circuit have adopted the Ninth Circuit's formulation of the nominative fair use doctrine – and rejected the Third Circuit's.  *See Audi AG v. Shokan Coachworks, Inc.*, 592 F. Supp. 2d 246, 269 (N.D.N.Y. 2008).

[4] While stating that it "need not address the viability of the [nominative fair use] doctrine," the Second Circuit has recognized that "a defendant may lawfully use a plaintiff's trademark where doing so is necessary to describe the plaintiff's product and does not imply a false affiliation or endorsement by the plaintiff of the defendant."  *Tiffany*, 600 F.3d at 102-03 (*citing Dow Jones & Co. v. Int'l Sec. Exch., Inc.*, 451 F.3d 295, 308 (2d Cir. 2006)).  In *Dow Jones & Co.*, the Second Circuit found no trademark violation by a defendant that offered investors the ability to purchase options of the plaintiff's trademarked Exchange Traded Fund ("ETF").  451 F.3d at 308.  "While a trademark conveys an exclusive right to the use of a mark in commerce in the area reserved, that right generally does not prevent one who trades a branded product from accurately describing it by its brand name, so long as the trader does not create confusion by implying an affiliation with the owner of the product."  *Id.*

*Audi*, 592 F. Supp. 2d at 269 (listing cases).  "[O]f the district courts in this circuit that have discussed a nominative fair use defense, all have followed the standard set forth by the Ninth Circuit in *New Kids*, rather than the Third Circuit's standard set forth in *Century 21* [*Real Estate Corp. v. Lending Tree, Inc.*, 425 F.3d 211 (3d Cir. 2005)]."  *Id*. at 269-70.  When a defendant asserts nominative fair use, the three-prong test set forth in *New Kids* substitutes for the likelihood of confusion inquiry.  *Id.*  (adopting the Ninth Circuit's decision in *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 801 (9th Cir. 2002)); *see also Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1182 (9th Cir. 2010) ("[N]ominative fair use replaces [the ordinary trademark-infringement analytical framework] as the proper test for likely consumer confusion whenever defendant asserts to have referred to the trademarked good itself.").

"The nominative fair use analysis is appropriate where a defendant has used the plaintiff's mark to describe the plaintiff's product, *even if the defendant's ultimate goal is to describe his own product*."  *Cairns*, 292 F.3d at 1151 (emphasis in original) (finding nominative fair use where defendant used the name and likeness of Princess Diana in the sale of Princess Diana memorabilia); *see also Ty, Inc. v. Publications Int'l, Ltd.*, No. 99-cv-5565, 2005 WL 464688, at *8 (N.D. Ill. Feb. 25, 2005) (summary judgment on nominative fair use denied only because of factual dispute over *extent* to which trademark was used, not the use of the trademark by defendant publisher to identify Beanie Babies as the subject of its books); *Yale & Towne Mfg. Co. v. Haber*, 7 F. Supp. 791, 792 (E.D.N.Y. 1934) ("Of course, defendant may advertise that it repairs Yale locks, but must do so in a way not calculated to deceive the public into the belief that the business conducted by it is conducted by plaintiff.").  Nominative fair use applies when all three of the following requirements are met: "[1] the product or service in question must be one not readily identifiable without use of the trademark; [2] only so much of the mark or marks

may be used as is reasonably necessary to identify the product or service; and [3] the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." *New Kids*, 971 F.2d at 308 (finding nominative fair use where two newspapers conducted survey about musical group "New Kids on the Block" that required readers to pay to enter a response to the survey). The undisputed evidence in the record shows that all three of these requirements are satisfied here.

First, there is no descriptive substitute for the certification at issue. As a practical matter, Defendants have to reference the CISSP® mark when explaining that they offer a course aimed at permitting the consumer to pass the CISSP® examination; failure to permit such a reference would lead to a tortured description of the mark. *See Welles*, 279 F.3d at 802 ("There is no other way [other than as Playboy Playmate of the Year for 1981] that Ms. Welles can identify or describe herself and her services without venturing into absurd descriptive phrases. To describe herself as the 'nude model selected by Mr. Hefner's magazine as its number-one prototypical woman for the year 1981' would be impractical as well as ineffectual in identifying Terri Welles to the public."); *Cairns*, 292 F.3d at 1153 ("Princess Diana's physical appearance is not readily identifiable without the use of her likeness[,]" and it is far simpler to use a photograph to depict a Princess Diana doll than to describe it as a doll "dressed in the stylish light-blue suit Princess Diana wore when she was presented with her signature flower and completely accessorized with a purse and a tiny bouquet of Princess of Wales Roses.").

Second, Defendants' reference to CISSP® in its marketing materials uses only so much of the mark as is reasonably necessary. (*See* Pl. Summ. J. Mem., Exs. M, P-T.) It is difficult to imagine how one could refer to any more of the CISSP® mark than necessary where the mark consists of an acronym and does not appear to have any other distinguishing features, such as a

distinctive typeset or symbol.  *Compare New Kids*, 971 F.2d at 308, n.7 ("[A] soft drink

competitor would be entitled to compare its product to Coca-Cola or Coke, but would not be

entitled to use Coca-Cola's distinctive lettering.").  Plaintiff's claim is not that Defendants used

too much of the mark, but, rather, that they added a word to the mark.  (*See* Compl., Ex. D.)

Third, there is nothing in Defendants' marketing materials that suggests sponsorship or

endorsement by Plaintiff.  This is evident from the advertisements themselves, two of which are

reproduced below:



(Pl. Summ. J. Mem., Ex. S (partial).)









(Pl. Summ. J. Mem., Ex. M (partial).)  The first advertisement includes multiple references to Security University and SU, and the second advertisement refers to Security University and "HITB JOBS."  Both include SU's logo at the top of the page, as well as express statements that Security University and/or HITB JOBS are offering the classes.  Neither includes language suggesting that (ISC)$^2$ itself is offering the classes.  Even after drawing all inferences in Plaintiff's favor, I conclude that no reasonable juror could find that these uses by Defendants of the CISSP® mark suggest that Defendants' training courses were sponsored or endorsed by Plaintiff.

Defendants' addition of the word "Master" before or after "CISSP®" does not prevent application of the nominative fair use doctrine, for it does not diminish the extent to which Defendants have satisfied the three requirements.  Regardless of whether Defendants use

"Master" to modify "CISSP®," or "CISSP®" to modify "Master," the services they are offering are "not readily identifiable without use of the [CISSP®] trademark."  As noted, the addition of the word "Master" does not run afoul of the second prong of the doctrine, which requires that "only so much of the mark . . . be used as is reasonably necessary."  Finally, attaching the word "Master" to "CISSP®" does not "suggest sponsorship or endorsement" by (ISC)[2].  Even Plaintiff acknowledges as much, stating that "Plaintiff does not argue that consumers would be confused that SU is the source of its own training courses."  (Pl. Opp. to Defs. Summ. J. Mem. at 6 n.3.)

Plaintiff's dislike of Defendants' characterization of the certification mark does not implicate the protection afforded by the trademark *infringement* laws, which are concerned with "whether there exists a likelihood that an appreciable number of ordinarily prudent purchasers will be misled, or indeed simply confused, as to the *source* of the goods in question."  *Thompson Med. Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 213 (2d Cir. 1985) (emphasis added).  There is no allegation and no evidence in the record that anyone was or could have been misled or confused about the identity of the entity offering the "goods in question," namely, training courses designed to prepare consumers for Plaintiff's certification exam and taught by Master CISSP® Clement Dupuis or CISSP® Master Clement Dupuis.

Much of Plaintiff's difficulty in establishing trademark infringement stems from the nature of its mark – a certification mark.  Because a certification mark is intended to signal a quality-related characteristic of the good, rather than source or origin, and because such a mark is specifically intended for use "in commerce" by persons other than its owner, 15 U.S.C. § 1127(2), it is hard to imagine a case in which use of a certification mark by a person who has met the requirements for certification would likely lead to confusion as to source or origin, or would not be a nominative fair use.  *See Tabari*, 610 F.3d at 1182 ("A finding of nominative fair use is

a finding that the plaintiff has failed to show a likelihood of confusion as to sponsorship or endorsement.")  No consumer of Kosher food is likely to think that use of a mark created by a religious certifying body on a package of food means that the certifying body actually made the food.  In a similar vein, no one viewing Defendants' advertisements referring to "Master CISSP®" was likely to think that Plaintiff  itself was offering classes to pass its own exam.[5]

Not surprisingly, Plaintiff cites no case in which a certifying body sued a certified person for trademark infringement for misusing the mark.  This Court has been able to identify only two types of potentially successful claims for certification mark infringement: (1) cases where the alleged infringer was not actually certified by the certifier, *see, e.g.*, *Idaho Potato*, 335 F.3d at 133 (sale of potatoes in bags with certification marks constituted infringement when the potatoes had not been certified as Idaho potatoes); *Cmty. of Roquefort v. William Faehndrich, Inc.*, 303 F.2d 494, 498 (2d Cir. 1962) (sale of cheese that bore the inscription "Imported Roquefort Cheese" constituted infringement where the cheese did not meet the geographic specifications required by the certification mark); and (2) cases where the alleged infringer offered a second mark that competed with or caused confusion regarding the plaintiff's certification mark.  *See, e.g.*, *Levy*, 104 F.3d at 43 (evaluating district court's application of a Trademark Trial and Appeal Board decision that found that defendant's kosher certification mark was "confusingly similar to the plaintiff's certification mark"); *E. I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc.*, 393 F. Supp. 502, 528 (E.D.N.Y. 1975) (defendant's "EFLON" mark for zippers infringed plaintiff's "TEFLON" certification mark for non-stick cookware-related products).  In short,

---

[5] While Plaintiff does offer its own training courses for the CISSP® examination, it does not use the CISSP® mark to advertise those services (Pl. Reply Br. at 8-9), lest it be found to violate the prohibition against use of a certification mark by a certifying body to promote its own goods and services.  *See* 15 U.S.C. Sec. 1064(5) (permitting cancellation of certification mark on the ground that the owner "engages in the production or marketing of any goods or services to which the certification mark is applied").

Plaintiff has failed to show how it is possible for the CISSP® certification mark to be infringed by a party who has met all the requirements for certification, and why any reference to the mark by such a certified person in connection with offering its own goods or services for sale would not constitute nominative fair use.  While I do not foreclose the possibility that the owner of a certification mark might successfully bring a trademark infringement suit against one who is entitled to use the certification mark, Plaintiff has failed to show why its claims may succeed under existing law.

Although not necessary to my conclusion that there was no trademark infringement, I note that Defendants included disclaimers in their advertisements, which served to further reduce any suggestion of sponsorship or endorsement, apparently because they were required to do so by Plaintiff's regulations governing use of its certification mark.  (*See* Pl. Summ. J. Mem., Ex. N ("Use of the Logo must clearly indicate that Certified is independent from (ISC)$^2$. . . . On marketing material . . . , the Logo shall be attributed to the International Information Systems Security Certification Consortium with the following attribution clause in all materials where it is used: "CISSP (or appropriate certification) is a registered mark of the International Information Systems Security Certification Consortium in the United States and other countries.").)  While disclaimers are not required under the nominative fair use doctrine to demonstrate the absence of a suggestion of sponsorship or endorsement, *see Cairns*, 292 F.3d at 1154-55, they reinforce this conclusion.  *See Welles*, 279 F.3d at 803 (clear statement of disclaimer a factor in satisfying third prong of nominative fair use analysis); *Ty*, 2005 WL 464688, at *10 (same).

Defendants' advertisements included one or more of the following disclaimers:

- SU CISSP® Prep classes are not endorsed, sponsored or delivered by (ISC)$^{2®}$

13

- CISSP® is a registered trademark of (ISC)²®

- CISSP® is a registered trademark of (ISC)²® (International Information Systems Security Certification Consortium) Inc.

- CISSP® is a registered trademark of (ISC)²® Inc. (International Information Systems Security Certification Consortium) Inc.  The materials for the Security University classes have been developed specifically for SU and are not endorsed, sponsored or delivered by (ISC)²®.  The goal of the course is to prepare security professionals for the CISSP® exam by covering the ten domains defined by (ISC)²®.

(Schneider Decl., ¶ 23; Compl., Ex. C; Pl. Summ. J. Mem., Ex. M, Ex. R, S.)  With the exception of Exhibit M, these disclaimers were in the same size font as the description of the training courses offered.  Further, they were not buried in a large block of text; rather, they were stated simply at the bottom of the webpage, broken out from other text.  Plaintiff's argument that, in order to be effective, the disclaimer "would have to disclaim [Defendants'] entire infringing use of the CISSP[®] Master and Master CISSP[®] marks" (Pl. Opp. to Defs. Summ. J. Mem. at 14) is nonsensical, because the disclaimer need only disclaim affiliation with Plaintiff, and because the language in the disclaimers used in Defendants' advertisements was that required by Plaintiff.

Relying on *Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1316 (2d Cir. 1987), which required the alleged infringer to "come forward with evidence sufficient to demonstrate that any proposed [disclaimer] materials would significantly reduce the likelihood of consumer confusion," Plaintiff urges me to discount the disclaimers because Defendants have failed to demonstrate their effectiveness.  (*See id.*)  *Home Box Office* is, however, distinguishable.  The Second Circuit found a disclaimer in that case inadequate – and shifted the burden to the alleged infringer to demonstrate its adequacy – because it had been printed on the inside of a multi-panel brochure when the infringing trademark reference appeared on the back panel.  832 F.2d at 1315.  The disclaimers in this case, by contrast, were located at

14

the bottom of the same website that referred to the CISSP® mark – a website that was accessed by IT professionals who were accustomed to reviewing websites and likely to know the location of website disclaimers.  *See id.* ("[E]ach case must be judged by considering the circumstances of the relevant business and its consumers."); *see also Tabari*, 610 F.3d at 1176 (in performing nominative fair use analysis, "our focus must be on the reasonably prudent consumer" in the "relevant marketplace").  Further, the *Home Box Office* court shifted the burden to the alleged infringer in a situation where the court had already found consumer confusion to be so significant that a preliminary injunction was warranted.  832 F.2d at 1316.  In a subsequent case, the Second Circuit suggested that such burden shifting was necessary only in "some cases involving more substantial confusion and trademark infringement."  *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 71 (2d Cir. 2002).  In my analysis of the third prong of the nominative fair use doctrine, I have not found there to be any confusion regarding sponsorship or affiliation of SU's training courses, let alone "substantial confusion."

Finally, Plaintiff makes a series of allegations and assertions about the placement of the word "Master" next to its mark that, in the end, do not amount to claims of trademark infringement at all.  Plaintiff complains that consumers will be confused "into believing that Plaintiff's mark is somehow capable of being 'mastered' and that such mastery is only available from [Defendants]," (Compl., ¶¶ 22, 42), and that Defendants "use . . . the CISSP[®] mark in a manner that misleads consumers to believe that Defendants' training course as [sic] being taught by an individual who has obtained a heightened certification level of competency that simply does not exist."  (Pl. Opp. to Defs. Summ. J. Mem. at 4; *see also id.* at 10; Pl. Reply for Summ. J. Mem. at 2.)  These grievances, however, are more aptly categorized as claims of dilution of the

distinctiveness of the CISSP® mark, which are discussed below.  They are not trademark infringement claims, which are concerned with confusion over source identification or endorsement.[6]  *Savin Corp.*, 391 F.3d at 456; *see also New Kids*, 971 F.2d at 308 ("Because [nominative fair use] does not implicate the source-identification function that is the purpose of trademark, it does not constitute unfair competition; such use is fair because it does not imply sponsorship or endorsement by the trademark holder.").  Further, to the extent Plaintiff believes it was improper to attach the word "Master" to "CISSP®" because it violated Plaintiff's rules of use, Plaintiff could have sued for breach of contract, but it chose not to do so.

It is also worth noting that Plaintiff's grievance that Defendants have suggested improperly that the CISSP® mark may be mastered is undercut by the fact that Plaintiff has allowed third parties to use this phrase without objection for several years.  (*See* Yacobelis Dep. at 186 ("Q. [The cover of the book] says 'The CISSP[®] and CAP Prep Guide, Platinum Edition.' Under that it says 'Mastering CISSP[®] and CAP.' . . . Is that a proper use of the CISSP® designation?  A. Absolutely."); Defs. Summ. J. Mem., Ex. 8 (RONALD L. KRUTZ & RUSSELL DEAN VINES, The CISSP® and CAP^CM Prep Guide, Platinum Edition, Mastering CISSP® and CAP (2007)), Ex. 10 (online course offered by Villanova University advertises that one can learn how to "Master the 10 domains or [sic] the CBK® (Common Bond of Knowledge) for both the CISSP® certification exam and the seven domains for the SSCP® certification exam"), Ex. 15

---

[6] Plaintiff also argues – for the first time in its summary judgment papers – that Defendants' use of the mark "implies that Plaintiff is affiliated with, endorsed, or sponsoring [sic] [a] non-existent level of certification."  (Pl. Opp. to Defs. Summ. J. Mem. at 4.)  This claim is not alleged in the Complaint.  Even if I were to permit Plaintiff's eleventh hour interpretation of its infringement claim, it would fail because there is no confusion as to source or origin for the reasons described above, i.e., there is no doubt that the training courses, however they were described, were being offered by and through Defendants.  The trademark infringement laws protect against confusion as to the source or origin of a product, not confusion about a product.  This claim similarly better fits under the rubric of trademark dilution.

(Superior Solutions, Inc.'s "CISSP[®] Certification Boot Camp" advertises "Master the ISC2 [sic] Common Body of Knowledge (CBK) and get your CISSP® certification by attending our boot camp.").)

Because I find that Defendants' references to "Master CISSP®" and "CISSP® Master" constituted nominative fair use, Defendants are entitled to summary judgment on the First and Second Counts.

### C.  Third and Fourth Counts: Claims for False Designation of Origin

The Third and Fourth Counts allege that Defendants "deceptively led [the public] to believe that Security University's training courses originate with or are sponsored or otherwise approved by the Plaintiff," in violation of 15 U.S.C. § 1125(a), which is also known as "false designation of origin."  Plaintiff brings its claim under section 1125(a)(1)(A), which prohibits a person from using:

> any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

(*See* Pl. Summ. J. Mem. at 7, 26.)  A claim for false designation of origin is analyzed in the same manner as a claim for trademark infringement.  *Van Praagh v. Gratton*, No. 13-cv-375, 2014 WL 292460, at *4-5 (E.D.N.Y. Jan. 28, 2014) ("Courts employ substantially similar standards when analyzing claims for trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1)(a) [and] false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a) . . . .").  And nominative fair use defeats a false designation of origin claim just as it does a trademark infringement claim.  *See New Kids*, 971 F.2d at 309 (granting summary judgment to defendant on trademark infringement, false designation of origin, and other unfair advertising claims

because "they all hinge on a theory of implied endorsement; there was none here as the uses in question were purely nominative"); *Stevo Design, Inc. v. SBR Mktg. Ltd.*, 968 F. Supp. 2d 1082, 1090 (D. Nev. 2013) (nominative fair use fatal to trademark infringement and false designation of origin claims).  Defendants are thus entitled to summary judgment on the Third and Fourth Counts for the reasons described above.

### D.  Fifth and Sixth Counts: Claims for Dilution of a Famous Mark

The Fifth and Sixth Counts allege that Defendants' actions dilute the distinctive qualities of the CISSP® mark, in violation of 15 U.S.C. § 1125(c).[7]  The statute sets forth two separate types of dilutive acts: (1) dilution by blurring, and (2) dilution by tarnishment.  Dilution by blurring is "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."  15 U.S.C. § 1125(c)(2)(B).  Dilution by tarnishment is "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark."  *Id*. at § 1125(c)(2)(C).  There are statutory exclusions for fair use, all forms of news reporting and commentary, and noncommercial use.  *Id*. at § 1125(c)(3).

The fame of a plaintiff's mark is a threshold requirement for finding dilution under either a blurring or tarnishment theory.  *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 105 (2d Cir. 2009).  Because I find that the issue of fame is dispositive, I need not discuss the other elements of Plaintiff's dilution claims.  "[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or

---

[7] After the Supreme Court held in *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003), that the Federal Trademark Dilution Act ("FTDA") required a showing of "actual dilution" to succeed on a dilution claim, Congress passed the Trademark Dilution Revision Act of 2005 (the "TDRA") to allow claimants to prevail upon a showing that the defendant's actions are "likely" to cause dilution.  *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 104 (2d Cir. 2009).

services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).  "[T]o be famous within the meaning

of the statute, the mark must have achieved a high degree of acquired distinctiveness, meaning

that it must have become very widely recognized by the U.S. consumer public as the designator

of the plaintiff's goods."  *TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 97 (2d

Cir. 2001) (insufficient evidence, at motion for preliminary injunction stage, that the mark "The

Children's Place" had acquired fame sufficient to meet the statutory requirement, even though it

had achieved $280 million in sales and operated 228 retail stores in 27 states under that mark).

When determining fame, the Court may consider all relevant factors, including: "(i) [t]he

duration, extent, and geographic reach of advertising and publicity of the mark, whether

advertised or publicized by the owner or third parties; (ii) [t]he amount, volume, and geographic

extent of sales of goods or services offered under the mark; (iii) [t]he extent of actual recognition

of the mark; and (iv) [w]hether the mark was registered under the Act of March 3, 1881, or the

Act of February 20, 1905, or on the principal register."  15 U.S.C. § 1125(c)(2)(A).

   When analyzing New York's anti-dilution statute, the Second Circuit held that "the fact

that a mark has selling power in a limited geographical or commercial area does not endow it

with a secondary meaning for the public generally."  *Mead Data Cent., Inc. v. Toyota Motor*

*Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030 (2d Cir. 1989) (finding no dilution because the

distinctiveness of the LEXIS mark is limited to the market for its services, which is comprised of

attorneys and accountants).  Since the 2005 passage of the TDRA, the rule articulated in *Mead* is

applicable to federal anti-dilution law because, "[b]y using the 'general consuming public' as the

benchmark, the TDRA eliminated the possibility of 'niche fame,' which some courts had

recognized under the previous version of the statute."  *Coach Servs., Inc. v. Triumph Learning*

*LLC*, 668 F.3d 1356, 1372 (Fed. Cir. 2012); *see also Dan-Foam A/S v. Brand Named Beds, LLC*,

500 F. Supp. 2d 296, 307 n.90 (S.D.N.Y. 2007) (The TDRA's inclusion of the phrase "widely recognized by the general consuming public" was "intended to reject dilution claims based on niche fame, *i.e.* fame limited to a particular channel of trade, segment of industry or service, or geographic region." (internal quotation marks and citations omitted)).

Courts, therefore, do not hesitate to dismiss trademark dilution claims when fame has been acquired only in niche markets. *See, e.g.*, *Verilux, Inc. v. Hahn*, No. 05-cv-254, 2007 WL 2318819, at *12 (D. Conn. Aug. 10, 2007) (granting defendant's motion for summary judgment: "[e]ven assuming Plaintiff is well-known in the lighting products market, such 'niche market' reputation is insufficient under both the TDRA and FTDA to be considered famous"); *Luv N' Care, Ltd. v. Regent Baby Products Corp.*, 841 F. Supp. 2d 753, 759 (S.D.N.Y. 2012) (dismissal for failure to allege facts "indicating that the cups', bottles', pacifiers', teething keys', and food containers' trademarks are recognized beyond a niche market, i.e., the baby product market"); *Heller Inc. v. Design Within Reach, Inc.*, No. 09-cv-1909, 2009 WL 2486054, at *4 (S.D.N.Y. Aug. 14, 2009) (dismissal for failure to allege that its trademarked Bellini Chair was famous beyond the "contemporary furniture niche of the population"); *Bd. of Regents, Univ. of Texas Sys. ex rel. Univ. of Texas at Austin v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 678-79 (W.D. Tex. 2008) (granting summary judgment after finding the longhorn silhouette logo not sufficiently famous to the general consuming public ("nearly the entire population of the United States"), even after acknowledging that UT athletics had "achieved a level of national prominence" and was famous among college football fans and, to a much lesser extent, college baseball and basketball fans).[8]

---

[8] The consensus among academic commentators is that fame in a niche market is insufficient to prevail on a federal dilution claim. *See, e.g.*, Barton Beebe, *A Defense of the New Federal Trademark Antidilution Law*, 16 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 1143, 1174 n.86

Although Plaintiff has shown that it has significant annual revenue (Yacobellis Dep., Defs.' Ex. 13) and that 80,000 individuals in more than 135 countries have obtained CISSP® certification (Yacobellis Decl., ¶ 18), this is insufficient to demonstrate recognition by the general consuming public, rather than a niche industry.  There is no dispute that professionals in the information security field know the CISSP® mark.  (Answer, ¶ 12; Schneider Dep. at 74.) Plaintiff has failed to provide any evidence, however, that the mark is known by the general public, and the evidence confirms that the CISSP® mark is a niche mark.  Plaintiff's advertising efforts are targeted at only those in the information security field.  (Yacobellis Dep. at 190-91 (e-mail advertisements are sent to leads that are generated by potential candidates requesting information on a website or at a trade show; paid web banners are placed on industry websites; print advertising, though no longer paid for by Plaintiff, was formerly placed in industry magazines).)  CISSP® certification is a requirement for hiring by a limited range of employers. (*See id.* at 51-52.)  Plaintiff's Rule 30(b)(6) witness could only speculate as to whether CISSP® is known to individuals outside of the information security field, and Plaintiff has never conducted surveys on this issue.  (*Id.* at 177-78 ("Q. Does (ISC)² consider the CISSP® mark to be famous? A. (ISC)² knows it to be internationally recognized around the world by governments,

---

(2006) ("One initial rule of thumb may be that if the finder of fact is a long-time resident of the United States and has not heard of the mark or is only vaguely familiar with it, then the mark is probably not 'famous' for purposes of anti[-]dilution protection. . . . The TDRA is simply not intended to protect trademarks whose fame is at all in doubt."); 4 J. THOMAS MCCARTHY, *supra*, § 24:104 (4th ed. 2011) ("I share the view of those courts that have expressed the desire to keep anti[-]dilution protection limited to a short list of truly famous and nationally renowned marks, as Congress intended. . . . The statutory requirement of 'fame' can be a potent barrier and its filtering mesh must be woven tightly by the courts so that only truly eminent and widely recognized marks are labeled as 'famous.'"); Marc L. Delflache, Sarah Silbert, Christina Hillson, *Life After Moseley: The Trademark Dilution Revision Act*, 16 TEX. INTELL. PROP. L.J. 125, 143 (2007) ("By specifically narrowing the class of marks protected by the Act to nationally famous marks known to the general public, the TDRA confirms that the federal dilution act creates protection only for a limited group of marks that are genuinely famous."  (internal quotation marks and citation omitted)).

corporations, and individuals in the [information security] profession. . . . Q. Do you know if CISSP® is known to people outside the information security profession? A. Yes . . . I believe yes. Q. Has (ISC)² ever conducted any surveys to determine how well-known the CISSP® mark is to the general public? A. CISSP® in general? No.").)  Plaintiff has offered no other evidence of the general fame of the CISSP® mark in support of its dilution claim.

When viewing all of the evidence in the light most favorable to Plaintiff, as I must, I find that no reasonable juror could find that the CISSP® mark is a "household" name.  *See TCPIP*, 244 F.3d at 99.  Therefore, Defendants are entitled to summary judgment on the Fifth and Sixth Counts.

### E.  Seventh and Eighth Counts: Claims for Violation of CUTPA

The final two claims allege violations of CUTPA, Conn. Gen. Stat. § 42-10a *et seq.*, because "[t]he acts complained of herein, when viewed in connection with the prior actions of Security University, demonstrate a pattern of deceptive and unfair trade practices."  (Seventh Count, ¶ 47; Eighth Count, ¶ 47.)  During oral argument, Plaintiff conceded that its CUTPA claims are derivative of its Lanham Act claims.  Because the acts Plaintiff complains of do not, as shown, constitute violations of the Lanham Act, and are derivative of its unsuccessful allegations of trademark infringement and dilution, Plaintiff's CUTPA claims necessarily fail. *See Verilux*, 2007 WL 2318819, at *10 (because plaintiff "failed to raise an issue of material fact regarding likelihood of confusion, and has presented no evidence that Defendants have engaged in deceptive or unfair conduct or have otherwise offended public policy," summary judgment granted as to CUTPA claim); *Omega S.A. v. Omega Eng'g, Inc.*, 396 F. Supp. 2d 166, 184 (D. Conn. 2005) (same).

**III.**     <u>**Motions to Seal**</u>

Plaintiff seeks to file under seal nine documents filed with its Motion for Summary Judgment: its unredacted Memorandum, unredacted Local Rule 56(a)(1) Statement, and Exhibits B, D, E, F, U, V, and W.  (Dkt. # 67.)   Plaintiff states that it "seeks to file under seal these documents because some of the information contained or referred to in these papers contain proprietary and confidential business information . . . ."  Citing the same grounds, Defendants seek to file under seal two documents filed with their Memorandum in Opposition to Plaintiff's Motion for Summary Judgment: their unredacted Local Rule 56(a)(2) Statement and Exhibit I. (Dkt. # 73.)

To obtain approval to file a document under seal, and thereby block a court document from public view, a party must make a particularized showing of good cause why the Court should depart from the strong presumption against sealing court records from public inspection. *See Nixon v. Warner Comm., Inc.*, 435 U.S. 589, 597-99 (1978); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120-22 (2d Cir. 2006); *U.S. v. Graham*, 257 F.3d 143, 150 (2d Cir. 2001); *U.S. v. Amodeo*, 44 F.3d 141, 146 (2d Cir. 1995); *Crossman v. Astrue*, 714 F. Supp. 2d 284 (D. Conn. 2009).  As the Second Circuit has made clear, the public and the press have a "qualified First Amendment right . . . to access certain judicial documents," including inspecting and making copies of judicial documents and docket sheets.  *Lugosch*, 435 F.3d at 120 (*quoting Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004)).  Upon a showing of compelling circumstances, the Court may order certain records to be sealed. *See id.* at 123 ("[D]ocuments used by parties moving for, or opposing, summary judgment should not remain under seal absent the most compelling reasons.") (*quoting Joy v. North,* 692 F.2d 880, 893 (2d Cir. 1982)); *Hartford Courant Co.*, 380 F.3d at 96 (judicial records enjoy a "presumption of

openness," a presumption that is rebuttable only "upon demonstration that suppression is essential to preserve higher values and is narrowly tailored to serve that interest" (internal quotations omitted)).

"In most cases, a judge must carefully and skeptically review sealing requests to insure that there really is an extraordinary circumstance or compelling need." *In re Orion Pictures Corp.*, 21 F.3d 24, 27 (2d Cir. 1994) (citation omitted); *see SEC v. TheStreet.com*, 273 F.3d 222, 232 (2d Cir. 2001). Moreover, ordinarily, a court must make that determination on the basis of a careful   review of the particular portions of each document a party wishes to file under seal and after considering whether the requested order is no broader than necessary to serve the interests that require protection. *See Amodeo*, 71 F.3d at 1050-51.

The parties have failed to make a particularized showing that each document or exhibit warrants sealing.  Plaintiff requests a blanket order sealing all portions of deposition testimony that were submitted.  Upon review, the Court has identified references to financial information, such as revenue generated from 2008 to 2013, as the only area of information that is sufficiently sensitive to warrant sealing.  "Documents falling into categories commonly sealed are those containing trade secrets, confidential research and development information, marketing plans, revenue information, pricing information, and the like."  *Cumberland Packing Corp. v. Monsanto Co.*, 184 F.R.D. 504, 506 (E.D.N.Y. 1999).  The Court therefore permits the sealing of Plaintiff's revenue figures.  (Pl. Summ. J. Mem. at 29, Ex. V; Pl. L.R. 56(a)(1), ¶ 20; Defs. L.R. 56(a)(2), ¶ 20.)

There is no basis provided for sealing the Yacobellis deposition.  Further, many of the facts she discusses, such as the history of Plaintiff's formation and requirements for CISSP[®] certification, are incorporated into Plaintiff's publicly filed version of its briefs and statement of

facts.  (*See* Pl. Summ. J. Mem., Ex. B; Defs. Opp. to Pl. Summ. J. Mem., Ex. I.)  Similarly, there is no basis for sealing the Schneider deposition, especially in light of the fact that Defendants did not file their portions of the Schneider deposition under seal and many of the facts referred to in her deposition are included in the publicly filed Schneider Declaration.  (*See* Pl. Summ. J. Mem., Exs. D-F; Defs. Opp. to Pl. Summ. J. Mem., Ex. A; Schneider Decl.)  With the exception of Plaintiff's financial information, referenced above, all of the redacted statements in the Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment and Local Rule 56(a)(1) Statement have been publicly disclosed in the Schneider Declaration and/or Deposition, and therefore may not be filed under seal.  There is no basis for filing under seal Exhibit U, which depicts statistics about the number of views of a specific advertisement sent by Defendants, especially because Defendants filed publicly the portion of the Schneider Deposition that discusses the statistics in this exhibit.  (*See* Defs. Opp. to Pl. Summ. J. Mem., Ex. A (Schneider Dep. at 193-97).)  Finally, Exhibit W is a short email exchange between Sondra Schneider and the email account joec@securityuniversity.net.  There is no discernible basis for sealing this exhibit.

Only specific references to Plaintiff's financial information may be filed under seal. Within 7 days of the date of entry of this order, the parties shall file unredacted versions of their papers on the docket in compliance with this order.

IV.     **Conclusion**

For the foregoing reasons, Defendants' Motion for Summary judgment is GRANTED, and Plaintiff's Motion for Summary Judgment is DENIED.[9]  Plaintiff's and Defendants' Motions to Seal are GRANTED IN PART, and DENIED IN PART.


IT IS SO ORDERED.


/s/
Michael P. Shea, U.S.D.J.


Dated:     Hartford, Connecticut
           August 7, 2014

---

[9] On March 13, 2013, U.S. District Court Judge Stefan R. Underhill granted Plaintiff's motion to dismiss Defendants' fifth counterclaim.  (Dkt. # 48.)  By granting summary judgment in favor of Defendants, the Court now resolves Defendants' remaining four counterclaims, which are effectively a mirror image of the Complaint and ask for declaratory judgment that Defendants have not violated the Lanham Act or CUTPA.  (*See* Answer and Countercl., dkt. # 28.)  In their prayer for relief, Defendants include a request that Plaintiff be enjoined from instituting any action for infringement of U.S. Trademark Registration No. 2,045,256 and other related claims under the Lanham Act or analogous state law.  As the parties did not analyze this issue in the summary judgment papers and Defendants have not provided any basis for such an injunction, this request for relief is denied.  Because Defendants' argument that "the present case was filed in an effort to extract the monies owed from the prior case between the Parties" (Defs. Summ. J. Mem. at 6) remains unsubstantiated, and Defendants have failed otherwise to brief or show any evidence of fraud, bad faith, or frivolousness by Plaintiff, their request for attorney's fees and costs is denied.  *See* 15 U.S.C. § 1117 ("The court in exceptional cases may award reasonable attorney fees to the prevailing party."); *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 194-95 (2d Cir. 1996) ("[T]he Lanham Act allows recovery of a reasonable attorney's fee only on evidence of fraud or bad faith. . . . Nothing . . . indicates that a different standard should apply for prevailing plaintiffs and prevailing defendants."); *see also Jovani Fashion, Ltd. v. Cinderella Divine, Inc.*, 820 F. Supp. 2d 569, 576 (S.D.N.Y. 2011) (applying a bad faith analysis to defendant's requests for attorney's fees *and* costs under the Lanham Act, the court held that "[w]hile [defendant] has alleged that [plaintiff] possessed an ulterior motive for bringing suit, namely to bully its commercial competition, such allegations remain unsubstantiated").